**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **UNITED STATES OF AMERICA** | |
| **v.** | **Case No. 23-cr-00199 (BAH)** |
| **DILLON COLBY HERRINGTON** | |
| **Defendant.** | |

## <u>UNITED STATES' SENTENCING MEMORANDUM</u>

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this sentencing memorandum in connection with the above-captioned matter. For the reasons set forth herein, the government requests that this Court sentence Dillon Colby Herrington to 41 months of incarceration, at the mid-point of the advisory guideline range of 37 to 46 months, 36 months of supervised release, $2000 in restitution, and the mandatory special assessment of $100.

### I.    INTRODUCTION

The defendant, Dillon Colby Herrington, participated in the January 6, 2021 attack on the United States Capitol—a violent attack that forced an interruption of the certification of the 2020 Electoral College vote count, threatened the peaceful transfer of power after the 2020 Presidential election, injured more than one hundred police officers, and resulted in more than 2.9 million dollars in losses.[1] Herrington, a former soldier in the United States Army , advanced with the mob

---

[1] As of July 7, 2023, the approximate losses suffered as a result of the siege at the United States Capitol was $2,923,080.05. That amount reflects, among other things, damage to the United States Capitol building and grounds and certain costs borne by the United States Capitol Police. The Metropolitan Police Department ("MPD") also suffered losses as a result of January 6, 2021,

to the West Plaza of the Capitol where he encountered police officers attempting to stop the rioters' advance toward the Capitol building.   He hurled a 4 x 4 piece of lumber at them, and, at one point, picked up a section of bike rack and advanced toward officers.   He also threw smaller objects at them like a water bottle and something he removed by vandalizing an electrical box.   He shouted violent threats toward officers, like, "Look me in the fucking eyes, motherfucker!   I'm coming for you!"   His aggression was so vehement that other rioters sought to restrain him as he was yelling threats at police.

Additionally, there is evidence suggesting that Herrington anticipated engaging in violence at the Capitol.   After berating and assaulting police on the West Plaza, Herrington had made his way to the Upper West Terrace and watched and filmed violence at the Lower West Terrace tunnel. Late in the afternoon, Police officers detained him as they were trying to clear the Upper West Terrace because they saw a large knife blade sticking out through his rear pants pocket.   Upon searching him they found a large military-style knife and a small stun gun on his person.   He was then forced to leave the Capitol grounds by officers after he had been there for hours.

---

and is also a victim. MPD recently submitted a total of approximately $629,056 in restitution amounts, but the government has not yet included this number in our overall restitution summary ($2.9 million) as reflected in this memorandum.   However, in consultation with individual MPD victim officers, the government has sought restitution based on a case-by-case evaluation.

The United States recommends that the Court sentence Herrington to 41 months of incarceration for his violation of 18 U.S.C. § 111(a)(1).   The sentence is within the advisory Guidelines' range of 37-46 months, which the government submits is the correct Guidelines calculation.   A 41-month sentence reflects the gravity of Herrington's conduct, but also acknowledges his early admission of guilt.

## II.      FACTUAL BACKGROUND

### A.      The January 6, 2021 Attack on the Capitol

The United States refers the Court to the stipulated Statement of Offense filed in this case, ECF No. 9, for a short summary of the January 6, 2021 attack on the United States Capitol by hundreds of rioters, in an effort to disrupt the peaceful transfer of power after the November 3, 2020 presidential election.

### B.      Herrington's Role in the January 6, 2021 Attack on the Capitol

#### a.      Aggressive conduct on the West Plaza

On the morning of January 6th, after attending the "Stop the Steal" rally at the Ellipse, then-29 year-old Herrington walked with his girlfriend and the crowd to the Capitol carrying a large Gadsden flag.[2]   (Image 1)   By 2:14 p.m., he was on the West Plaza at the forefront of a massive a crowd of rioters confronting and taunting officers in riot gear at a police line.   (Image 2)

---

[2] This flag, which depicts a coiled rattlesnake above the words, "don't tread on me", on a yellow background, was designed by South Carolina congressman and general, Christopher Gadsden, in 1775 during the Revolutionary War.   Variations of the flag were later espoused by secessionists during the Civil War.



*Image 1 – Herrington marching to Capitol (circled in yellow, girlfriend in red)[3]*



*Image 2 – Herrington at forefront, taunting officers with vulgar gesture (officers in blue frame)[4]*

---

[3]   Image 1 is a screen capture at 0:10 from an open-source video available at this location:
https://www.facebook.com/tina.deboer.52/videos/10222715661193914

[4]   Image 2 is a screen capture at 11:25 from an open-source video available at this location:
https://archive.org/details/2S69NcvXrFEfnuJCC.

His demeanor was hostile and aggressive.   It became even more hostile and confrontational after he saw that his girlfriend, who had been wildly swinging a flag close to officers' faces, had been sprayed with a chemical crowd-control agent.   Herrington, who is 6'2", 245 lbs., and athletically built, approached the officers repeatedly, pointing at them, displaying his middle finger to them, and shouting threats.   (Images 3, 4, 5) (Exhibit 1 at 18:38 - 19:30)



*Image 3 – Herrington displaying a vulgar gesture to officers[5]*

---

[5] Image 3 is a screen capture at 24:01 from an open-source video available at this location: https://archive.org/details/owrhgGHHqDqH4zefH



*Image 4 – Herrington pointing at officers[6]*

---

[6] Image 4 is a Reuters Connect image which is publicly available at this location:
https://i.dailymail.co.uk/1s/2021/01/27/21/38553796-9193957-The_Capitol_Police_Union_released_a_scathing_statement_voicing_t-a-59_1611782599995.jpg



*Image 5 – Herrington yelling at officers[7]*

At approximately 2:15 p.m., Herrington yelled at officers,

**"This is what you fucking get!"**

Four minutes later, he approached the police line, shouted,

**"Fucking pussies!"**

and had to be restrained by two other rioters.   (Image 6) (Exhibit 2 at 08:22 – 8:30)

---

[7] Image 5 is a screen capture at 19:09 from BWC footage that is publicly available at
https://archive.org/details/DZ7CnoNLN7cLMXPJr



*Image 6 – Herrington being restrained by other rioters[8]*

About a minute later, he approached an unidentified officer and shouted,

**"Look me in the fucking eyes, motherfucker!   I'm coming for you."**

At 2:21 p.m., Herrington threw water at police Sgt. K.K, who was in the corner of a raised

platform behind a waist-high wall (the "platform").   (Image 7)

---

[8] Image 6 is a screen capture at 08:27 from an open-source video available at this location:
https://archive.org/details/jgY7GqxfJJFPGtd7j



*Image 7 –Herrington throwing water on Sgt. K.K.[9]*

In response, police sprayed him with a chemical crowd-control agent.    Enraged, Herrington threw an empty, plastic water bottle, and then a COVID mask, and then a full water bottle toward officers standing at the corner of the platform.    The bottle struck the top of the wall around the platform and ricocheted.    A half-minute later, Herrington launched a 4 x 4 piece of lumber at an unidentified officer who was standing in the corner of the platform.    (Image 8) (Exhibit 3 at 10:25 – 10:37)    The 4 x 4 did not strike the officer, but only because the officer, who was unaware of what Herrington was doing, happened to move as Herrington was mid-throw.    (Image 9)    When Sgt. K.K. re-appeared in the corner, Herrington displayed his middle finger toward him.    (Image 10)

---

[9] Image 7 is a screen capture at 02:21 from an open-source video available at this location: https://archive.org/download/bzyCgSRXW96CL8jBe/2257774569.mpeg4



*Image 8 – Herrington throwing 4 x 4 piece of lumber[10]*

---

[10] Images 8, 9, and 10 are screen captures at 10:36 and 10:43 from an open-source video available at this location: https://www.youtube.com/watch?v=9mt8YGpJ5vs&t=636



*Image 9 – 4 x 4 flying through the air, just missing officer (framed in orange)*



*Image 10 – Herrington making vulgar gesture toward Sgt. K.K. post-throw*

Herrington then picked up a bike rack and began walking toward Sgt. K.K and the officers on the platform.   (Image 11)



*Image 11 – Herrington carrying a bike rack toward Sgt. K.K. (in blue frame)[11]*

He appears to have been sprayed because he abruptly throws down the bike rack and changes direction.   He then pulls an unknown object out of a box marked "DANGER HIGH VOLTAGE" and throws it in the direction of the same officers.   (Image 12)

---

[11] Images 11 and 12 are screen captures at 57:24 and 57:31 from an open-source video available at this location: https://archive.org/details/wkZmQmTKT8rFwqc2t



*Image 12 – Herrington tearing an object out of an electrical box*

### b. Continued presence and detention at the Capitol

At about 2:45 p.m., Herrington retreated from the base of the Capitol building to recover from the effects of the spray.   At 3:00 p.m., however, he rejoined the mob and approached the building again.   He ascended to the Upper West Terrace (UWT) by walking up the balustrade of the Northwest Stairs.   (Image 13)



*Image 13 – Herrington climbing balustrade (circled in yellow; girlfriend in red)*[12]

He perched himself above the entrance to the Lower West Terrace tunnel to watch and record the violence taking place below.   (Images 14, 15)

---

[12] Image 13 is a screen capture at 0:30 from an open-source video available at this location: https://web.archive.org/web/submit?url=https://video.parler.com/zT/8j/zT8j36zQNFGb.mp4



*Image 14 – Herrington observing violence at the LWT tunnel[13]*

---

[13] Image 14 is a publicly available Will Allen-DuPraw image entitled "fall-1816.jpg".



*Image 15 – Herrington recording violence at the LWT tunnel[14]*

---

[14] Image 15 is a Times-Herald/Wanda Carroll image entitled "DSC_0373.jfif" that is publicly available at this location: https://times-herald.com/news/2021/01/local-photographer-captures-wednesdays-march-tocapitol

At approximately 4:57 p.m., MPD officers attempting to clear rioters from the UWT noticed that Herrington had a knife blade sticking out of his rear pants pocket.   They detained him and removed the knife.   (Images 16, 17, 18) (Exhibit 4 at 3:17 – 20:23)



*Image 16 – Knife blade protruding from hole in Herrington's pants pocket*[15]

---

[15] Images 16, 17, 18, and 19 are screen captures from a BWC video entitled "MPD Officer D.D. BWC.mp4".



*Image 17 – Officers carefully isolating protruding knife blade*



*Image 18 – Officer holding knife removed from Herrington's pocket*

While he was detained, Herrington informed the officers that he was also carrying a "taser."   Officers recovered an object from his pocket that appeared to be a small stun gun. (Image 19)



*Image 19 – Officer holding Herrington's stun gun*

The officers bound Herrington's hands behind his back, sat him down on a low wall, ascertained his identity, and spoke to him.   Unaware of Herrington's prior assaultive conduct, they secured the weapons in Herrington's backpack and escorted him off Capitol grounds.   By that time, Herrington had been at the Capitol for almost three hours.

### III.    THE CHARGES AND PLEA AGREEMENT

On June 22, 2023, Herrington pleaded guilty pursuant to a written plea agreement to a one-count Information charging him with Assaulting, Resisting, or Impeding Certain Officers in violation of 18 U.S.C. §111(a)(1).

## IV.   STATUTORY PENALTIES

Herrington now faces sentencing on one Count of Assaulting, Resisting, or Impeding Certain Officers in violation of 18 U.S.C. §111(a)(1).

As noted by the plea agreement and the Presentence Report issued by the U.S. Probation Office, the defendant faces up to eight years of imprisonment, a term of supervised release of not more than three years, a fine up to $250,000, and a mandatory special assessment of $100.

## V.   THE SENTENCING GUIDELINES AND GUIDELINES ANALYSIS

As the Supreme Court has instructed, the Court "should begin all sentencing proceedings by correctly calculating the applicable Guidelines range." *United States v. Gall*, 552 U.S. 38, 49 (2007).   As the parties and the Probation Office agree, the Guidelines analysis for this matter follows:

| | |
|---|---|
| Base Offense Level (U.S.S.G. § 2A2.2(a)) | 14 |
| S.O.C. - Use of Dangerous Weapon (U.S.S.G. § 2A2.2(b)(2)(B)) | + 4 |
| Adjustment – Official Victim (U.S.S.G. § 3A1.2(b)) | + 6 |
| Acceptance of responsibility (U.S.S.G. §3E1.1) | - 3 |
| **Total Adjusted Offense Level:** | **21** |

*See* Plea Agreement at ¶ 5(A).   Pursuant to U.S.S.G. § 2A2.4(a), the Base Offense Level for a Section 111 offense is 10.   But when the assault constituted "aggravated assault," the cross-reference in U.S.S.G. § 2A2.4(c)(1) states that the court should apply U.S.S.G. § 2A2.2.   An aggravated assault includes a "felonious assault that involved…a dangerous weapon with intent to cause bodily injury (i.s., not merely to frighten) with that weapon;" or an "intent to commit another

felony." U.S.S.G. § 2A2.2, cmt. n.1. The Guidelines do not define "assault" or "felonious assault," and sentencing courts have looked to the common law to define "assault" for Guidelines purposes. *See United States v. Hampton*, 628 F.3d 654, 660 (4th Cir. 2010). Assault encompasses conduct intended to injure another or presenting a realistic threat of violence to another. *See United States v. Dat Quoc Do*, 994 F.3d 1096, 1099 (9th Cir. 2021) (federal common-law assault includes (1) "a willful attempt to inflict injury upon the person of another," or (2) "a threat to inflict injury upon the person of another which, when coupled with an apparent present ability, causes a reasonable apprehension of immediate bodily harm.") By hurling a large piece of lumber at an officer with his back turned to Herrington, he willfully attempted to injure the officer. Additionally, Herrington admitted that he assaulted a police officer with the intent to obstruct, impede and interfere with law enforcement officers in the lawful performance of their official duties during a civil disorder in violation of 18 U.S.C. § 231(a)(3). PSR ¶ 24.

The U.S. Probation Officer calculated the defendant's criminal history as category I, which is not disputed. PSR ¶ 53. Accordingly, based on both the Probation Officer's and the parties' calculation of the defendant's total adjusted offense level, after acceptance of responsibility, at Level 21, Herrington's Guidelines imprisonment range is 37 to 46 months' imprisonment.

## VI.   SENTENCING FACTORS UNDER 18 U.S.C. § 3553(A)

In this case, sentencing is guided by 18 U.S.C. § 3553(a). As described below, on balance, the Section 3553(a) factors weigh in favor of a term of incarceration of at least 41 months.

### A.   Nature and Circumstances of the Offense

As shown in Section II(B) of this memorandum, Herrington's felonious conduct on January 6, 2021 was part of a massive riot that almost succeeded in preventing the certification vote from

being carried out, thwarting the peaceful transition of Presidential power, and throwing the United States into a Constitutional crisis.   Herrington personally participated in and personally contributed to the attack on police officers trying to defend the Capitol building.   The nature and circumstances of Herrington's offense were serious, and fully support the government's recommended sentence of 41 months.

### B.   The History and Characteristics of the Defendant

Herrington has a history of substance abuse, but the United States is unaware of any evidence that intoxication played a role in the commission of the instant offense.   He has been compliant with the conditions of his pre-trial release.   PSR ¶ 13.   While he has no prior convictions, he was involved in a violent assault while in the military about two years prior to the events of January 6th.   As a member of the United States military, Herrington took an oath to support and defend the Constitution against all enemies, foreign and domestic.   He pledged his loyalty to the country and his subordination to its laws.   Yet, on January 6th, he participated actively in a violent riot at the United States Capitol the purpose of which was to disrupt and thwart the peaceful transition of power, a key feature of our constitutional democracy.

### C.   The Need for the Sentence Imposed to Reflect the Seriousness of the Offense and Promote Respect for the Law

As with the nature and circumstances of the offense, this factor supports a sentence of incarceration.   Herrington's assaults and violent threats toward police officers on January 6 showed abject disrespect for the law.   His conduct toward officers defending and protecting the United States Capitol building and the people inside was belligerent and confrontational.   He used his physical stature and unhinged anger to intimidate them – suggesting that they had better yield or suffer physical assault at his hands.   Had the officer on the platform not moved at the last

second, he could have been seriously injured by the hefty piece of thrown lumber.   Moreover, the fact that Herrington brought dangerous weapons – including an unsheathed military knife - with him to the Capitol suggests that he contemplated and prepared for violence in advance.

### D.  The Need for the Sentence to Afford Adequate Deterrence

#### General Deterrence

A significant sentence is needed "to afford adequate deterrence to criminal conduct" by others.   18 U.S.C.§ 3553(a)(2)(B).   The need to deter others is especially strong in cases involving domestic terrorism, which the breach of the Capitol certainly was.[16]   The demands of general deterrence weigh strongly in favor of incarceration, as they will for nearly every case arising out of the violent riot at the Capitol.

#### Specific Deterrence

The need for the sentence to provide specific deterrence to this particular defendant also weighs in favor of a sentence of 41 months incarceration.

Herrington expressed a willingness to accept responsibility at an early stage of the criminal prosecution.   He has also provided to the Probation Officer, in connection with the pre-sentence investigation, what appears to be a sincere and contrite expression of remorse for his actions.   PSR ¶ 32-39.

Notably, however, this expression of remorse did not come until after he was facing consequences for his actions.   *See United States v. Matthew Mazzocco*, 1:21-cr-00054 (TSC), Tr. 10/4/2021 at 29-30 ("[The defendant's] remorse didn't come when he left that Capitol.   It didn't come when he went home.   It came when he realized he was in trouble.   It came when he realized

---

[16]  *See* 18 U.S.C. § 2331(5) (defining "domestic terrorism").

that large numbers of Americans and people worldwide were horrified at what happened that day. It came when he realized that he could go to jail for what he did.   And that is when he felt remorse, and that is when he took responsibility for his actions.") (statement of Judge Chutkan).

### E.   The Importance of the Guidelines

"The Guidelines as written reflect the fact that the Sentencing Commission examined tens of thousands of sentences and worked with the help of many others in the law enforcement community over a long period of time in an effort to fulfill [its] statutory mandate."   *Rita v. United States*, 551 U.S. 338, 349 (2007).   As required by Congress, the Commission has "'modif[ied] and adjust[ed] past practice in the interests of greater rationality, avoiding inconsistency, complying with congressional instructions, and the like.'"   *Kimbrough v. United States*, 552 U.S. 85, 96 (2007) (quoting *Rita*, 551 U.S. at 349); 28 U.S.C. § 994(m).   In so doing, the Commission "has the capacity courts lack to base its determinations on empirical data and national experience, guided by professional staff with appropriate expertise," and "to formulate and constantly refine national sentencing standards."   *Kimbrough*, 552 U.S. at 108 (cleaned up).   Accordingly, courts must give "respectful consideration to the Guidelines." *Id.* at 101.

### F.   Unwarranted Sentencing Disparities

Section 3553(a)(6) of Title 18 directs a sentencing court to "consider … the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct."   So long as the sentencing court "correctly calculate[s] and carefully review[s] the Guidelines range, [it] necessarily [gives] significant weight and consideration to the need to avoid unwarranted disparities" because "avoidance of unwarranted disparities was clearly considered by the Sentencing Commission when setting the Guidelines ranges."   *Gall v. United States*, 552 U.S. 38, 54 (2007).   In short, "the Sentencing Guidelines are themselves an anti-

disparity formula." *United States v. Blagojevich*, 854 F.3d 918, 921 (7th Cir. 2017); *accord United States v. Sanchez*, 989 F.3d 523, 540 (7th Cir. 2021).   Consequently, a sentence within the Guidelines range will ordinarily not result in an unwarranted disparity.   *See United States v. Smocks*, D.D.C. 21-cr-198 (TSC), Sent. Hrg. Tr. at 49 ("as far as disparity goes, … I am being asked to give a sentence well within the guideline range, and I intend to give a sentence within the guideline range.") (statement of Judge Chutkan).

Moreover, Section 3553(a)(6) does not limit the sentencing court's broad discretion "to impose a sentence sufficient, but not greater than necessary, to comply with the purposes" of sentencing.   18 U.S.C. § 3553(a).   After all, the goal of minimizing unwarranted sentencing disparities in Section 3553(a)(6) is "only one of several factors that must be weighted and balanced," and the degree of weight is "firmly committed to the discretion of the sentencing judge."   *United States v. Coppola*, 671 F.3d 220, 254 (2d Cir. 2012).   The "open-ended" nature of the Section 3553(a) factors means that "different district courts may have distinct sentencing philosophies and may emphasize and weigh the individual § 3553(a) factors differently; and every sentencing decision involves its own set of facts and circumstances regarding the offense and the offender."   *United States v. Gardellini*, 545 F.3d 1089, 1093 (D.C. Cir. 2008).   "[D]ifferent district courts can and will sentence differently—differently from the Sentencing Guidelines range, differently from the sentence an appellate court might have imposed, and differently from how other district courts might have sentenced that defendant."   *Id*. at 1095.   "As the qualifier 'unwarranted' reflects, this provision leaves plenty of room for differences in sentences when warranted under the circumstances."   *United States v. Brown*, 732 F.3d 781, 788 (7th Cir. 2013).[17]

---

[17] If anything, the Guidelines ranges in Capitol siege cases are more likely to understate than overstate the severity of the offense conduct. *See United States v. Knutson*, D.D.C. 22-cr-31 (FYP),

In cases for which the Sentencing Guidelines apply, "[t]he best way to curtail 'unwarranted' disparities is to follow the Guidelines, which are designed to treat similar offenses and offenders similarly." *United States v. Bartlett*, 567 F.3d 901, 908 (7th Cir. 2009). *See id*. ("A sentence within a Guideline range 'necessarily' complies with § 3553(a)(6).").[18]

Although the other defendant discussed below participated in the Capitol breach on January 6, 2021, several salient differences explain the differing recommendation and sentence. While no previously sentenced case contains the same balance of aggravating and mitigating factors present here, the sentence in the following case provides a suitable comparison to the relevant sentencing considerations in this case.

In *United States v. Grady Owens*, Case No. 21-cr-286 (BAH), Owens yelled at, taunted, and displayed his middle finger to officers on the West Plaza, as Herrington did. He assaulted one body-armored officer by hitting him once with a skateboard. Harrington, by comparison, threw a heavy piece of lumber at an officer, along with other objects, and started toward officers carrying a section of bike rack. Owens did attempt, unsuccessfully, to enter the Capitol building via the Rotunda doors and was part of a crowd that was pushing against police officers who were trying to block the threshold of the doors. This Court sentenced Owens to 37 months in custody. Unlike Owens, Herrington was detained by police because of a large knife sticking out of his

---

Aug. 26, 2022 Sent. Hrg. Tr. at 24-25 ("If anything, the guideline range underrepresents the seriousness of [the defendant's] conduct because it does not consider the context of the mob violence that took place on January 6th of 2021.") (statement of Judge Pan).

[18] A routinely updated table providing additional information about the sentences imposed on other Capitol breach defendants is available here: https://www.justice.gov/usao-dc/capitol-breach-cases. To reveal that table, click on the link "SEE SENTENCES HANDED DOWN IN CAPITOL BREACH CASES." The table shows that imposition of the government's recommended sentence in this case would not result in an unwarranted sentencing disparity.

pocket; he was found in possession of not just the knife but also a stun gun; and he had to be escorted off the grounds by police.   For these reasons, a higher sentence of 41 months is appropriate here.

## VII.   RESTITUTION

The Victim and Witness Protection Act of 1982 ("VWPA"), Pub. L. No. 97-291 § 3579, 96 Stat. 1248 (now codified at 18 U.S.C. § 3663), "provides federal courts with discretionary authority to order restitution to victims of most federal crimes." *United States v. Papagno*, 639 F.3d 1093, 1096 (D.C. Cir. 2011); *see* 18 U.S.C. § 3663(a)(1)(A) (Title 18 offenses subject to restitution under the VWPA).[19]   Generally, restitution under the VWPA must "be tied to the loss caused by the offense of conviction," *Hughey v. United States*, 495 U.S. 411, 418 (1990); identify a specific victim who is "directly and proximately harmed as a result of" the offense of conviction, 18 U.S.C. § 3663(a)(2); and is applied to costs such as the expenses associated with recovering from bodily injury, 18 U.S.C. § 3663(b).   At the same time, the VWPA also authorizes a court to impose restitution "in any criminal case to the extent agreed to by the parties in a plea agreement." *See* 18 U.S.C. § 3663(a)(3). *United States v. Anderson*, 545 F.3d 1072, 1078-79 (D.C. Cir. 2008).

Those principles have straightforward application here.   The parties agreed, as permitted under 18 U.S.C. § 3663(a)(3), that Herrington must pay $2,000 in restitution, which reflects in part the role Herrington played in the riot on January 6.[20]   Plea Agreement at ¶ 12.   As the plea

---

[19] The Mandatory Victims Restitution Act, Pub. L. No. 104-132 § 204, 110 Stat. 1214 (codified at 18 U.S.C. § 3663A), "requires restitution in certain federal cases involving a subset of the crimes covered" in the VWPA, *Papagno*, 639 F.3d at 1096, including crimes of violence, "an offense against property … including any offense committed by fraud or deceit," "in which an identifiable victim or victims has suffered a physical injury or pecuniary loss." 18 U.S.C. § 3663A(c)(1).

[20] Unlike under the Sentencing Guidelines for which (as noted above) the government does not qualify as a victim, *see* U.S.S.G. § 3A1.2 cmt. n.1, the government or a governmental entity can

agreement reflects, the riot at the United States Capitol had caused "approximately $2,923,080.05" in damages, a figure based on loss estimates supplied by the Architect of the Capitol and other governmental agencies as of July, 2023.   *Id.* (As noted above in footnote 1, the amount of damages has since been updated by the Architect of the Capitol, USCP, and MPD.)   Herrington's restitution payment must be made to the Clerk of the Court, who will forward the payment to the Architect of the Capitol and other victim entities.   *See* PSR ¶ 108.

The applicable procedures for restitution orders issued and enforced under these two statutes is found in 18 U.S.C. § 3664. *See* 18 U.S.C. § 3556 (directing that sentencing court "shall" impose restitution under the MVRA, "may" impose restitution under the VWPA, and "shall" use the procedures set out in Section 3664).

Both [t]he VWPA and MVRA require identification of a victim, defined in both statutes as "a person directly and proximately harmed as a result of" the offense of conviction. *Hughey v. United States*, 495 U.S. 411, 418 (1990) (interpreting the VWPA). Both statutes identify similar covered costs, including lost property and certain expenses of recovering from bodily injury.   *See Papagno*, 639 F.3d at 1097-97; 18 U.S.C. §§ 3663(b), 3663A(b).   Finally, under both the statutes, the government bears the burden by a preponderance of the evidence to establish the amount of loss suffered by the victim.   *United States v. Bikundi*, 926 F.3d 761, 791 (D.C. Cir. 2019).

In deciding whether to impose restitution under the VWPA, the sentencing court must take account of the victim's losses, the defendant's financial resources, and "such other factors as the

---

be a "victim" for purposes of the VWPA.  *See United States v. Emor*, 850 F. Supp.2d 176, 204 n.9 (D.D.C. 2012) (citations omitted).

court deems appropriate." *United States v. Williams*, 353 F. Supp. 3d 14, 23-24 (D.D.C. 2019) (quoting 18 U.S.C. § 3663(a)(1)(B)(i)).   The MVRA, by contrast, requires imposition of full restitution without respect to a defendant's ability to pay.[21]

Because the defendant in this case engaged in criminal conduct in tandem with hundreds of other defendants charged in other January 6 cases, and his criminal conduct was a "proximate cause" of the victims' losses if not a "cause in fact," the Court has discretion to apportion restitution and hold the defendant responsible for her individual contribution to the victims' total losses.   *See Paroline v. United States*, 572 U.S. 434, 458 (2014) (holding that in aggregate causation cases, the sentencing court "should order restitution in an amount that comports with the defendant's relative role in the causal process that underlies the victim's general losses"). *See also United States v. Monzel*, 930 F.3d 470, 476-77, 485 (D.C. Cir. 2019) (affirming $7,500 in restitution toward more than a $3 million total loss, against a defendant who possessed a single pornographic image of the child victim; the restitution amount was reasonable even though the "government was unable to offer anything more than 'speculation' as to [the defendant's] individual causal contribution to [the victim's] harm"; the sentencing court was not required to "show[] every step of its homework," or generate a "formulaic computation," but simply make a "reasoned judgment.");

More specifically, the Court should require Herrington to pay $2,000 in restitution for his conviction.   This amount fairly reflects Herrington's role in the offense and the damages resulting from his conduct.   Moreover, in cases where the parties have entered into a guilty plea

---

[21] Both statutes permit the sentencing court to decline to impose restitution where doing so will "complicat[e]" or "prolong[]" the sentencing process. *See* 18 U.S.C. §§ 3663(a)(1)(B)(ii), 3663A(c)(3)(B).

agreement, two thousand dollars has consistently been the agreed upon amount of restitution and the amount of restitution imposed by judges of this Court where the defendant was not directly and personally involved in damaging property. Accordingly, such a restitution order avoids sentencing disparity.

## VIII.   CONCLUSION

For the reasons set forth above, the government recommends that the Court impose a sentence of 41 months imprisonment, 36 months of Supervised Release, $2000 in restitution, and the mandatory special assessment of $100.

Respectfully submitted,

MATTHEW M. GRAVES
UNITED STATES ATTORNEY


BY:    ___/s/___David J. Perri_____
DAVID J. PERRI
WV Bar No. 9219
Assistant United States Attorney (Detailed)
United States Attorney's Office
Northern District of West Virginia