UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA,          )<br>)<br>Plaintiff,          )<br>)<br>v.          )<br>)<br>DILLON HERRINGTON,          )<br>)<br>Defendant.          ) | Case No. 1:23-CR-199-BAH<br><br>Hon. Beryl A. Howell<br>United States District Judge |

### DEFENDANT DILLON HERRINGTON'S SENTENCING MEMORANDUM AND MOTION FOR DOWNWARD VARIANCE

On November 9, 2023, Defendant Dillon Herrington will appear before this Court to be sentenced for the only felony of which he has been convicted. Recognizing there is no excuse for his conduct on January 6, 2021, and that he alone is responsible for his role in the events of that day, Mr. Herrington can only ask that this Court look at the entire picture of his life, including his atypical journey of participation in the Capitol riots, and sentence him to a term of imprisonment below the advisory guidelines range.

### FACTUAL AND PROCEDURAL BACKGROUND

On June 22, 2023, pursuant to a plea agreement, Mr. Herrington pled guilty to a felony information charging him with Assaulting, Resisting, and Impeding Certain Officers, in violation of 18 U.S.C. § 111(a)(1). (R.21, Presentence Investigation Report (PSR), Page 2, ¶ 4.) The Presentence Investigation Report (PSR) calculated Mr. Herrington's advisory sentencing guidelines range to be 37 to 46 months, based on a total offense level of 21 and criminal history category I. (*Id*. at Page 16, ¶ 86.) Based on Mr. Herrington's personal characteristics, his conduct while on pretrial release, his genuine

remorse, and his timely acceptance of responsibility, the PSR writer has recommended the Court sentence Mr. Herrington to a term of incarceration well below the advisory guidelines range: 12 months and one day of confinement and two years of supervised release. (R.22, Sentencing Recommendation, Pages 1-2.) The PSR also recommends that the Court permit Mr. Herrington to voluntarily surrender to his designated Bureau of Prisons facility for execution of sentence. (*Id*.)

## ARGUMENT:
## This Court Should Vary Below the Guidelines Range, Pursuant to the 18 U.S.C. § 3553(a) Sentencing Factors.

When sentencing a defendant who has been found guilty of a crime, this Court must comply with the basic objectives of sentencing as set forth in 18 U.S.C. § 3553(a). *Rita v. United States*, 551 U.S. 338, 347 (2007). In determining a sentence that is "sufficient, but not greater than necessary," the court must consider whether the "particular sentence to be imposed" meets the goals of sentencing: "to reflect the seriousness of the offense," "to promote respect for the law," "to provide just punishment for the offense," "to afford adequate deterrence to criminal conduct," "to protect the public from further crimes of the defendant," and "to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner." 18 U.S.C. § 3553(a)(2)(A)-(D). The lowest possible sentence that is minimally sufficient to meet those goals must be imposed. 18 U.S.C. § 3553(a). The Court is to consider the nature and circumstances of the offense, the history and characteristics of the defendant, the kinds of sentences available, the advisory guideline range, the need to avoid unwarranted sentencing disparities, and the need for restitution. *Id*.

### A.     The Nature and Circumstances of Mr. Herrington's Offenses

This Court may grant a downward variance based on the nature and circumstances of the offense. 18 U.S.C. § 3553(a)(1). Here, Mr. Herrington admitted to assaulting, resisting, and impeding certain officers by throwing a 4 x 4 piece of lumber at a Metropolitan Police Department officer during the riot at the U.S. Capitol on January 6, 2021. Fortunately, the lumber never made contact with the officer, and the officer was not injured. Mr. Herrington also threw a water bottle and shouted obscenities at law enforcement officers, as set forth in the PSR.

In January 2021, Mr. Herrington's girlfriend (from whom he is now separated), who held strong views on politics and was outspoken about those beliefs, asked Mr. Herrington to travel from their shared city in Alabama to Washington, D.C., to watch then-President Donald Trump speak at an event. That event was the "Stop the Steal" rally, which took place near the Washington Monument. Although, by his own admission, Mr. Herrington has "never been politically involved in action or ideology," following the rally Mr. Herrington went along with and participated with the crowd walking to the West Plaza side of the Capitol building. There, Mr. Herrington candidly lost control of himself, and recklessly and foolishly engaged in the crimes that have brought him before this Court.

On January 6, 2021, thousands of rioters who attended the rally and subsequently marched to the Capitol either believed or were told to believe one thing: that the 2020 Presidential Election had been fraudulently determined and, therefore, the certification of the vote count by the U.S. House of Representatives and U.S. Senate taking place within

the Capitol building must be stopped. In rough psychological terms, the mob mentality encouraging violence and hostility at the Capitol is commonly attributed to the "groupthink" phenomenon, which Mr. Herrington admits to engaging in, to some extent, via consumption of certain media. But as he has reflected on the events of January 6, Mr. Herrington has recognized that his story is different. Rather than blaming "the mob," "the media," or even certain political figures for his crimes, as so many have, Mr. Herrington acknowledges his actions that day were a product of his own internal strife. He was a man wrestling with internal anger and bitterness fueled by personal failures - particularly, the failure to meet physical standards that would have allowed him to continue with the Army – exacerbated by alcohol and anabolic steroid abuse, which changed his personality and manifested as the aggression he displayed at the Capitol.

In the nearly three years since the riot, Mr. Herrington, while on pretrial release, has accepted responsibility for his actions, engaged in intense self-reflection, educated himself on how his own thoughts and feelings led him to engage in his January 6 actions, taken steps to address those thoughts and feelings, and expressed genuine remorse for his "abhorrent behavior."

   **B.  The History and Characteristics of Mr. Herrington**

This Court may grant a downward variance based on the history and characteristics of Mr. Herrington. 18 U.S.C. § 3553(a)(1). As Mr. Herrington discussed with the PSR writer, he was raised by his father beginning around the time he was four years old. His mother, who struggled with substance abuse and borderline personality disorder, had no involvement in his life or upbringing after that time. To this day, Mr.

Herrington does not have contact with his mother and does not know her whereabouts. Looking back, Mr. Herrington describes his childhood as chaotic; between his mother's mental illness and his then-stepmother's erratic behavior, Mr. Herrington grew up believing extreme emotional highs and lows were normal.

Mr. Herrington experienced extreme social anxiety as an adolescent, which impacted his relationships with and belonging among his peers, as well as his academic performance at school. Because of those issues, after 10th grade Mr. Herrington elected to complete his GED through a homeschooling program and a community college rather than return to the public school system he had attended up to that point.

In 2016, Mr. Herrington enlisted in the United States Army. During basic training, he suffered knee tears in both legs which were never properly addressed or healed, and for which he still experiences discomfort to this day. It was during his time in the Army that Mr. Herrington also started drinking heavily, developing an alcohol abuse problem. For most of his term of service, Mr. Herrington worked with the North Atlantic Treaty Organization (NATO) Alliance while stationed in Germany. In 2019, Mr. Herrington was discharged from the Army after he failed to pass the physical fitness test due to his knee injuries. Following his discharge from the Army, Mr. Herrington's alcohol use worsened. He also began abusing anabolic steroids, which increased his aggression, anxiety, and paranoia, after getting into the "gym scene."

Both before and after his service, Mr. Herrington has held full-time, gainful employment in various industries, including retail, hospitality, security, and manufacturing. Following his discharge from the Army, however, Mr. Herrington felt

5

lost and struggled with feelings of shame, anger, and bitterness after his lack of success foreclosed his otherwise stable career path.

After an arrest for driving under the influence of alcohol and the events of January 6, 2021, Mr. Herrington ceased his use of alcohol and anabolic steroids altogether. When discussing the changes these events produced in him, Mr. Herrington stated that they have "forced me to face myself" and his feelings as "an angry, unfulfilled man" who "allowed myself to be consumed by my rage" and "feared not having purpose in the world or a place." Mr. Herrington has, instead, moved back in with his father while his case is pending, worked on healing himself, and turned to cooking, rather than alcohol or steroid use, to assist with his coping skills and bring meaning to his life.

Mr. Herrington speaks with great clarity in both what led to his actions on January 6, as well as how he has changed his lifestyle since then. While Mr. Herrington does not blame his ex-girlfriend for choices that were clearly his, Mr. Herrington believes that, within that relationship, he started to take on politicized feelings and energy that were not truly "his." He started acting differently and dressing in ways that he, his friends, and the people who know him best did not recognize and who he does not identify with. Since the events of January 6 and leaving his relationship, Mr. Herrington has spent time in deep introspection trying to correlate his patterns of behavior. Though he hasn't been able to get a proper diagnosis or treatment due to lack of insurance, Mr. Herrington sees in himself similar highs and lows that his mother and stepmother exhibited, characterized by emotional outbursts and extreme highs and lows, and believes that the

diagnosis he recalls receiving as a teenager may have significantly contributed to his reactions and past behavior.

Mr. Herrington has also been working for approximately the last four months, 60 to 65 hours each week, as a line cook at an establishment in Madison, Alabama. Currently working through the various stations within the kitchen, Mr. Herrington is finding balance, purpose, and passion in learning the art of cooking. To him, it is not only a way to keep him busy and out of trouble, but also a new career path to follow. Mr. Herrington hopes to continue progressing through the ranks as a cook.

In addition to his newfound passion for cooking, Mr. Herrington has removed problematic people and places from his life—things that have kept him from the path he wants to be on. He has replaced that time with rediscovered hobbies: playing guitar, both alone and with other people; trading in the "gym scene" for outdoor activities and running; and using physical activity as a means to feel healthy rather than aggravating his aggression in an unhealthy environment. Although it is not something Mr. Herrington has ever participated in or spoken about growing up, he also wants to attend therapy to continue to pursue the journey he is on.

Throughout his life so far, Mr. Herrington has shown a history of persevering through adversity and positively bouncing back from the trials he has faced. He hopes the Court will consider the steps he has taken while on pretrial release over the last few years, including his self-awareness about what, personally, contributed to Mr. Herrington's actions in the instant offense, as well as his self-reflection and action in addressing it so those actions do not happen again, when determining his sentence.

### C. The Need for the Sentence to Acknowledge the Seriousness of the Offense, Promote Respect for the Law, and Provide Just Punishment

Section 3553(a)(2)(A) requires the Court to consider "the need for the sentence imposed . . . to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense." Collectively, these sentencing objectives are generally referred to as "retribution":

> First, retributive, or "just desserts" theory considers only the defendant's past actions, not his or her probable future conduct or the effect that the punishment might have on crime rates or otherwise. Second, retribution examines the actor's degree of blameworthiness for his or her past actions, focusing on the offense being sentenced . . . Third, the degree of blameworthiness of an offense is generally assessed according to two kinds of elements: the nature and seriousness of the harm caused or threatened by the crime; and the offender's degree of culpability in committing the crime, in particular, his degree of intent (*mens rea*), motives, role in the offense, and mental illness or other diminished capacity.

Richard S. Frase, *Excessive Prison Sentences, Punishment Goals, and the Eighth Amendment: "Proportionality" Relative to What?*, 89 Minn. L. Rev. 571, 590 (2005).

The sentence proposed by the probation writer of a year and a day of incarceration followed by two years of supervised release can adequately address the goals set out in 18 U.S.C. § 3553(a)(2)(A). When considering the harm Mr. Herrington is proportionally responsible for, he is the first to admit the police "were just performing their duties" and that he "ma[d]e an enemy out of brave people who never asked to be put in that situation." As someone who has also served on behalf of the U.S. Government and now faces the loss of governmental benefits and all the consequences that come with being a convicted felon, Mr. Herrington is already experiencing the grave effects of his actions. While out and in compliance with his conditions during his long period of pretrial

release, Mr. Herrington has already shown his understanding of the seriousness of the offense, that he is not only willing but also respects the law and parameters he must operate within, and pursued new habits to assure his actions and aggression will not escalate again. In sum, the sentence proposed by the PSR writer is just punishment for Mr. Herrington when the collateral punishments are also considered.

### D. The Need to Adequately Deter Future Criminal Conduct

Pursuant to 18 U.S.C. § 3553(a)(2)(B), the Court must also consider "the need for the sentence imposed . . . to afford adequate deterrence to criminal conduct." Amy Baron-Evans, a leading scholar on federal sentencing and member of the Sentencing Resource Counsel, writes:

> Indeed, while many believe that the higher the sentence, the greater the effect in deterring others, the empirical research shows no relationship between sentence length and deterrence. The general research finding is that "deterrence works," in the sense that there is less crime with a criminal justice system than there would be without one. But the question for the judge is "marginal deterrence," *i.e.*, whether any particular quantum of punishment results in increased deterrence and thus decreased crime. Here the findings are uniformly negative: there is no evidence that increases in sentence length reduce crime through deterrence.

Amy Baron-Evans, *Sentencing by the Statute*, Defender Services Office, https://www.fd.org/sites/default/files/criminal_defense_topics/essential_topics/sentencing_resources/sentencing-by-the-statute.pdf (Apr. 27, 2009). Thus, a vast increase in the length of the sentence, relative to administration of *some* punishment, does not increase the deterrent effect.

Mr. Herrington knows the administration of punishment is coming and that, in and of itself, is enough to provide the adequate deterrent effect the court must consider

9

in determining the sentence. Deterrence will be accomplished as readily and as fully for Mr. Herrington with the sentence recommendation from the PSR writer as it would be for a much lengthier term of incarceration. For this reason, Mr. Herrington submits that deterrence can be accomplished through the sentence proposed by the PSR writer.

### E. The Need to Protect the Public from Further Crimes of Mr. Herrington

18 U.S.C. § 3553(a)(2)(C) instructs the Court to consider "the need for the sentence imposed . . . to protect the public from further crimes of the defendant." The objective of this provision is to consider Mr. Herrington's risk of recidivism and what, if any, danger he poses to the public. As a defendant with a criminal history score of zero along with compliance while out on pretrial release for a significant period of time, Mr. Herrington has demonstrated his ability to both follow the law and conform his behavior to the additional conditions of release. In his PSR, Mr. Herrington also submitted that he has self-sustained remission from his use of alcohol and anabolic steroids, of which the PSR writer took note when considering whether to administer a drug screen in conjunction with the PSR. Based on these considerations, Mr. Herrington is not only extremely unlikely to ever reoffend but also poses no danger to the community.

### F. The Need to Avoid Unwarranted Sentencing Disparities

18 U.S.C. § 3553(a)(6) requires the Court to consider "the need to avoid unwarranted disparities among defendants with similar records who have been found guilty of similar conduct" in determining a sentence. Pursuant to Section 3553(a)(3), the Court is to consider "the kinds of sentences available." The Court may sentence Mr. Herrington to anywhere between zero and eight years in prison. The Court may also

impose anywhere between zero and three years of supervised release in lieu of or in addition to a period of imprisonment. Because the Guidelines are advisory, the Court is free to impose a sentence anywhere within that range so long as it is properly justified under 18 U.S.C. § 3553.

When determining whether Mr. Herrington should receive a sentence below the Guidelines, he asks that the Court consider the sentences ordered in similarly situated cases, as it is required to do, along with the individual characteristics he possesses that differentiate him from others who have been similarly charged. Namely, that Mr. Herrington neither holds nor harbors the deep politically-driven anger that led many similarly situated defendants to act on January 6, but rather used the group ideology and engaged in hyper-aggressive behavior "as a vehicle for my own [personal] anger and pain." Based on these factors, Mr. Herrington's personal history and characteristics, and Mr. Herrington's compliance while on pretrial reliance, the PSR writer submits that the proposed sentence is appropriate given the sentences of similarly situated individuals and the kind of sentences available. Mr. Herrington asks that the Court consider the same in its sentencing determination.

## CONCLUSION

The Dillon Herrington who stands before this Court for sentencing is a different man than the one who angrily and impetuously marched on Washington, D.C., on January 6, 2021. Since that day, Mr. Herrington has actively engaged in reforming his attitudes and behaviors, including removing the "people, places, and substances" that contributed to his thoughts and feelings about himself, and drove his anger and

aggression. He has also reformed his lifestyle, turning to cooking rather than substances, and reflected on what led to his actions at the Capitol on January 6. Mr. Herrington recognizes that the behavior he displayed cannot be blamed on the media, political figures, or others in attendance that day; that those are a woefully inadequate explanation for how he, personally, became involved. Mr. Herrington, alone, made the choices to take the actions he did and for that, he has actively examined and pursued rehabilitation of his behavior on his own while this case has been pending.

Mr. Herrington respectfully requests this Court grant a downward variance and sentence him to 12 months and one day of confinement and two years of supervised released, as well as allow him to voluntarily surrender for his term of confinement, in conformance with the PSR writer's recommendation, and as permitted in determining a sentence that is sufficient, but not greater than necessary, to achieve the goals of sentencing, pursuant to 18 U.S.C. § 3553(a).

Respectfully submitted,

Dated: October 26, 2023

*/s/ Heath M. Lynch*
HEATH M. LYNCH
SBBL LAW, PLLC
60 Monroe Center St NW, #500
Grand Rapids, MI 49503
heath@sbbllaw.com
616-458-5500